**Affirm; Opinion Filed November 24, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00850-CV**

**AMERICAN HONDA MOTOR CO., INC., Appellant**
**V.**
**SARAH MILBURN, JOHN MILBURN, AND CAROLYN MILBURN,**
**Appellees**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-16470**

## MEMORANDUM OPINION

Before Justices Pedersen, III, and Reichek[1]
Opinion by Justice Pedersen, III

American Honda Motor Co., Inc. (Honda) appeals from a judgment for actual

damages in this products liability lawsuit. Honda contends the design defect claim

is barred by the statutory presumption of non-liability for products complying with

federal safety standards. Honda also contends that the evidence is insufficient to

support the jury's findings on the design defect claim. Finally, Honda asserts that

---

[1] Justice Bill Whitehill was a member of the original panel, but Justice Whitehill is no longer a member
of the Court, and he did not participate in the issuance of this opinion.

the trial court erred in granting partial summary judgment on Honda's affirmative defenses related to comparative apportionment. We affirm the trial court's judgment.

## Background

*The Accident*

Shortly after midnight on November 15, 2015, a group of six friends summoned an Uber to take them from Dallas's Uptown district to the Knox Street Pub, a short distance away. Uber driver Arian Yusufzai responded and picked up the group in a 2011 Honda Odyssey minivan. Sarah Milburn was seated in the middle seat of the third row. Sarah buckled the ceiling-mounted shoulder strap of the seat belt across her body.[2] The detachable anchor was not connected to the anchor buckle attached to the seat; Sarah did not fasten the detachable anchor to the anchor buckle.

Yusufzai drove north on McKinney Avenue. As he entered the intersection of McKinney and Fitzhugh Avenue, a pickup truck traveling west on Fitzhugh hit the passenger-side front door of the minivan. The force of the impact caused the minivan to overturn, coming to rest on its roof. Everyone but Sarah was able to get out of the minivan unassisted; no other passenger sustained significant injuries.

Sarah, however, was not as fortunate. She was severely injured in the impact—the cervical portion of her spine was dislocated and fractured. Paramedics extracted her from the vehicle and took her to the hospital. Sarah's cervical injuries

---

[2] At trial, there was conflicting testimony as to whether Sarah, or any of her friends, were wearing seat belts. Sarah testified that she buckled the shoulder strap portion of her belt. Emily Klein, who sat next to Sarah in the third row seat, testified that she saw Sarah reach up for the seat belt and buckle it.

resulted in quadriplegia paralysis. She now lives with her parents, John and Carolyn Milburn, and she requires assistance for nearly every activity of daily living.

*Seat Belt Systems*

Most vehicles are equipped with "Type 2" seat belt systems that integrate a shoulder belt and a lap belt.[3] These seat belt systems are also known as "three-point" restraints. The shoulder belt portion attaches to the vehicle's frame or seat (point one) and the lap belt portion attaches to the vehicle's floor or seat (point two). When drivers and passengers sit down and pull the seat belt across their bodies, they create the third point by latching the belt into the buckle located at their hips.

This design is modified for seat belts that restrain passengers sitting in the middle of a vehicle's second or third row of seats. Because these seat belts cannot be attached to the vehicle's frame or floor, they are anchored to the top and bottom of the seat. These seat belt systems are known as all-belts-to-seat (ABTS) restraints. The ABTS restraint systems work exactly like the three-point restraint systems. Passengers pull the belt across their bodies and latch it into the buckle at their hips.

The seat belt system that Honda used for the third row middle seat of the 2011 Honda Odyssey in which Sarah Milburn was a passenger on November 15, 2015 isn't a Type 2 or an ABTS system—it is a ceiling-mounted detachable anchor seat belt system. The shoulder belt portion is attached to the ceiling. The lap belt portion

---

[3] Historically, most motor vehicle seat belts were "Type 1" seat belts—lap belts only.

has a detachable anchor that latches into an anchor buckle in the seat near the right hip. This detachable anchor allows the seat belt to be completely disengaged from the seat, and to retract completely into a small compartment in the ceiling, slightly behind the middle seat. Before a passenger sits in this seat, the belt is supposed to be pulled down from the ceiling and the detachable anchor is supposed to be latched into the anchor buckle. When the detachable anchor is connected in this intended manner, passengers can sit down, pull the belt across their bodies, and fasten a second latch into a buckle on the opposite-side, thus securing their shoulders and laps and creating a three-point restraint.

*Honda Odyssey "Magic" Seat*

The third row of the 2011 Odyssey minivan has a foldaway feature that enables the third-row seat to fold directly into a recessed compartment located behind the third row in the vehicle's floor pan, thus creating a flush floor surface in the passenger cabin (the "magic" seat). When this "magic" seat is folded into the floor, and the other seats in the vehicle are removed, the minivan's cargo capacity significantly increases.

According to Honda, the ceiling-mounted detachable anchor seat belt system facilitates the use of its "magic" seat. When owners or drivers want to fold down the "magic" seat, they use a special key-like device to unlatch the detachable anchor from the anchor buckle, thus allowing the seat belt to retract into the ceiling

compartment. When the third-row seat is returned to its upright position, the detachable anchor is supposed to be reattached to its anchor buckle.

Honda provides information and warnings regarding its seat belts, including warnings that the Odyssey's detachable seat belt anchor should be connected when the third-row middle seat is in the upright position. In addition to warnings in the owner's manual, Honda also includes warning labels on the seat belt itself.

*The Lawsuit*

Sarah and her parents brought suit against Honda, Uber Technologies and its subsidiaries Uber USA and Rasier (the Uber entities), Uber driver Yusufzai, and Dawood Kohistani, the owner of the Odyssey minivan.[4] Prior to the trial, the Milburns settled with all of the defendants except Honda.[5] The Milburns then filed their first amended petition asserting claims against Honda for negligence and gross negligence in designing, manufacturing, and marketing the minivan's third-row middle seat belt system. The Milburns' defective design theory was that the seat belt system was not adequately designed, manufactured, or marketed to minimize the risk of injury. They further alleged that the seat belt system was defective and dangerous because it was likely that an ordinary passenger would be unable to use

[4] Honda filed cross-claims against the Uber entities, Yusufzai, and Kohistani.

[5] The trial court granted the Milburns' motion to dismiss, with prejudice, all claims against the Uber entities Yusufzai, and Kohistani.

the seatbelt as designed because the intended method of use was dangerously unclear, confusing, counter intuitive, and misleading.

Honda filed an amended answer generally denying the allegations in the Milburns' first amended petition, asserting affirmative defenses as to the settling parties, and urging application of the comparative responsibility provisions of the Texas Civil Practice and Remedies Code. The Milburns moved for partial summary judgment as to the settling Uber entities to bar submission of the Uber entities to the jury in a proportionate responsibility question. The trial court granted the Milburns' motion, excluded evidence pertaining to the Uber entities during the trial, and omitted the Uber entities from the court's charge.

A jury found Honda liable for negligently designing a defective seat belt system. The jury also found that the Uber driver's and Sarah's negligence proximately caused Sarah's injury. The jury apportioned responsibility 63% to Honda, 32% to Yusufzai, and 5% to Sarah. After deducting 5% from the jury's award, the past and future damages awarded totaled $35,735,026.76. The trial court signed a final judgment awarding $25,924,214.16 to the Milburns after adding prejudgment interest and applying a $10,000,000.00 credit based on the Milburns' settlement with the other defendants. Because the finding as to Honda exceeded 50%, Honda was jointly and severally liable for the recoverable damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.013(b)(1). The trial court denied Honda's motion for new trial and motion to modify the judgment. This appeal followed.

**Discussion**

## A.  Product Liability Claim

To recover on a product liability claim based on an alleged design defect, "a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Emerson Electric Co. v. Johnson*, 627 S.W.3d 197, 203 (Tex. 2021) (quoting *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009)); *see also* CIV. PRAC. & REM. § 82.005(a). A "producing cause" is "a substantial factor in bringing about an injury, and without which the injury would not have occurred." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007).

## B.  Presumption of Non-liability

In its first issue, Honda contends the Milburns cannot recover on their design defect claim because the Odyssey minivan met or exceeded all federal safety standards, which raised a statutory presumption of non-liability that was not rebutted. At trial, Honda asserted that the Milburns' claim fell within the definition of a "products liability action" under section 82.001 of the Texas Civil Practice and Remedies Code. *See* CIV. PRAC. & REM. § 82.001(2). As such, Honda urged that there is a rebuttable presumption that Honda is not liable for any injury to the Milburns for any injury caused by some aspect of the seatbelt system design if the design complied with mandatory federal safety standards or regulations. *See id.*

§ 82.008(a). Honda argued that because there was no dispute that the subject 2011 Honda Odyssey complied with all applicable federal safety standards governing the seatbelt system, Honda was entitled to the presumption that Honda was not liable under any products-liability theory.

### 1. Sufficiency of the Evidence

Honda contends that conclusive evidence supports the jury's finding that the presumption applies. Honda further contends there is no evidence to support the jury's finding that the Milburns established an exception to that presumption. In reviewing a legal sufficiency challenge to the evidence, we determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 807. Evidence is legally insufficient when (a) evidence of a vital fact is completely absent; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810. Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711

(Tex. 1997)). However, evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011); *Thompson & Knight LLP v. Patriot Expl., LLC*, 444 S.W.3d 157, 162 (Tex. App.—Dallas 2014, no pet.).

When reviewing the factual sufficiency of the evidence, we consider all the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016). We must not substitute our judgment for that of the jury and should remain cognizant that the jury is the sole judge of witness credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

### 2. Presumption of Non-liability

Section 82.008(a) of the civil practice and remedies code provides:

> In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product's formula, labeling, or design complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.

Civ. Prac. & Rem. § 82.008(a). In *Kia Motors Corporation v. Ruiz*, the Texas Supreme Court explained that under this section, a manufacturer is entitled to a

presumption of non-liability for its product's design if the manufacturer establishes that:

> (1) the product complied with mandatory federal safety standards or regulations,
>
> (2) the standards or regulations were applicable to the product at the time of manufacture, and
>
> (3) the standards or regulations governed the product risk that allegedly caused the harm.

432 S.W.3d 865, 870 (Tex. 2014) (interpreting section 82.008(a)).

The "mandatory federal safety standards" that Honda asserts gave rise to a non-liability presumption in this case are the Federal Motor Vehicle Safety Standards (FMVSS). *See generally* 49 C.F.R. §§ 571.101–.500. These standards were prescribed under the National Traffic and Motor Vehicle Safety Act of 1966, as amended. Pub. L. 89–563, § 1, 80 Stat. 718 (1966) (current version at 49 U.S.C. §§ 30101–30170). The FMVSS are safety standards. *Kia*, 432 S.W.3d at 872. They are mandatory because a vehicle cannot be sold in the United States unless is complies with these standards. *Id.* at 870; 49 U.S.C. § 30112(a)(1) (prohibiting sale of a vehicle unless it complies with the applicable standards).

### 3. Exception to the Presumption

The section 82.008(a) presumption of non-liability is rebuttable. A claimant may rebut the presumption by establishing that:

> (1) the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable

–10–

risks of injury or damage; or

(2) the manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action.

*Id*. § 82.008(b). Here, the Milburns raised only the first exception, arguing that the standards were inadequate to protect the public from unreasonable risks of injury resulting from misuse of Honda's detachable anchor seat belt system.

### 4. Jury Findings

The trial court submitted two separate jury questions pertaining to section 82.008. Question No. 1(b) asked whether Honda had established the elements of section 82.008(a)'s rebuttable presumption of non-liability. The jury agreed that Honda was entitled to a presumption of non-liability and answered "yes." However, the jury also found that the Milburns had rebutted Honda's presumption. Question No. 1(c), which was conditioned on an affirmative answer to No. 1(b), asked whether the Milburns established the exception in section 82.008(b)(1) that rebuts the presumption. The jury answered "yes."

#### a. The evidence supports the jury's answer to Question No. 1(b)

Honda contends it complied with FMVSS 208 (restraint-system performance requirements), 209 (restraint-system hardware), and 210 (seat belt anchor points and strength) in designing and manufacturing the 2011 Odyssey minivan. Charles Thomas, the corporate representative for Honda, testified that the 2011 Odyssey met or exceeded all these standards. The Milburns do not dispute that the FMVSS applied

to the Odyssey and were complied with; indeed, they acknowledge that Honda could not have sold the Odyssey in the United States without complying with these standards. However, the Milburns urge, and Honda does not disagree, that the federal standards are minimum standards.

The parties do not agree that the FMVSS govern the product risk that allegedly caused the harm in this case. FMVSS 208 expressly states that its purpose is "to reduce the number of deaths of vehicle occupants, and the severity of injuries by ... specifying equipment requirements for active and passive restraint systems." Honda contends that the jury could have reasonably found that the "product risk" in this case was the dual-detachable feature of the seat belt system. Honda argues that the FMVSS govern this product risk for two reasons. First, the FMVSS expressly allow the type of detachable anchor system that Honda installed for the third-row middle seat. For passenger cars manufactured on or after September 1, 2007, FMVSS 208 provides:

> Any inboard designated seating position on a seat for which the entire seat back can be folded (including the head restraints and any other part of the vehicle attached to the seat back) such that no part of the seat back extends above a horizontal plane located 250 mm above the highest SRP located on the seat may meet the requirements of S4.1.5.5.1[6] by use of a belt incorporating a release mechanism that detaches both the lap and shoulder portion at either the upper or lower anchorage point, but not both. The means of detachment shall be a key or key-like object.

---

[6] S4.1.5.5.1 requires that "each passenger car shall have a Type 2 seat belt assembly that conforms to Standard No. 209 and to S7.1 and S7.2 of this standard at each rear designated seating position." FMVSS 209 specifies requirements for seat belt assemblies.

FMVSS 208, S4.1.5.5.2. At trial, experts for both parties agreed that FMVSS 208 allows the type of detachable anchor seat belt system that Honda installed for the Odyssey's third-row middle seat. Honda argues that because FMVSS permits exactly what Honda installed, the jury reasonably concluded that the FMVSS governs the product risk at issue.

Second, Honda urges that in promulgating FMVSS 208, the National Highway Traffic Safety Administration (NHTSA) contemplated the possibility that a detachable system could be misused so it explored the possibility of requiring an "integrated" seat belt system—the same ABTS seat belt system that the Milburns urge as the safer alternative design in this case. Honda contends that its cross-examination of Steven Meyer, the Milburns' seat belt expert, shows that the NHTSA weighed safety and utility considerations, in addition to cost, in concluding that the ABTS seat belt design was a sub-optimal design for some types of seats. Thus, according to Honda, the NHTSA considered the very risk that the Milburns assert (misuse of a detachable belt), as well as the Milburns' alleged safer alternative (the ABTS seat belt system), in deciding to approve the detachable design that Honda installed in the Odyssey.

The Milburns define "product risk" more narrowly, arguing that the "product risk" was the possible misuse of the dual-detachable seat belt system. The Milburns

contend that like the product risk in *Kia*,[7] the product risk here involved a failure—specifically, the failure of owners, drivers, and passengers to use the detachable anchor seat belt correctly. *See Kia*, 432 S.W.3d at 874. They argue that the FMVSS does not govern the product risk that caused harm to Sarah because the standards presume that the seat belts are correctly used in their intended manner. They note that Michael Klima, Honda's seat belt expert, testified that nothing in the regulations analyzes the risk that people will not understand how to operate the Odyssey's dual-detachable seat belt system.

The Milburns also disagree with Honda's characterization of Meyer's testimony. They clarify that Meyer's testimony about the NHTSA's concerns about possible misuse of the detachable seat belt referred to a different type of misuse—specifically, a seat belt system that allowed the lap belt to be detached from and used independently of the shoulder belt, resulting in a risk that passengers would improperly use only the lap belt. The Milburns assert that risk is entirely different from the risk of misusing a Type 2 detachable anchor seat belt system when the detachable anchor is not latched—a risk that passengers would improperly use only the shoulder belt. Accordingly, the Milburns reason that because FMVSS does not

---

[7] In discussing the product risk at issue, both parties refer to the *Kia* court's discussion of FMVSS 208 with respect to a vehicle's air bags and other restraint systems. In *Kia*, the court defined the product risk to be the risk of occupant injury due to the failure of the air bag to reliably activate and deploy. *Kia*, 432 S.W.3d at 874. The court noted "while FMVSS 208 clearly contemplates *what* occupant-restraint systems are required, it does *not* contemplate the likelihood of their failure to deploy and thus does not address that issue." *Id*.

address the risk that the dual-detachable seat belt will be misused in such a way that the passenger uses only the shoulder belt, the FMVSS does not govern the product risk and Honda is not entitled to a presumption of non-liability.

The Milburns assert that Sarah was not fully restrained because the seat belt anchor was detached—the double latch belt system was not fastened the way Honda intended. The jury could have decided that the risk presented by the seat belt system is that both seat belt attachments can be detached (the dual-detachable feature of the seat belt system). However, there was some evidence that by mandating a key or key-like device to detach the anchor, FVMSS 208 governed the risk associated with detachment of the anchor. Considering the evidence in the light most favorable to the verdict and indulging every reasonable inference that would support it, we conclude the evidence at trial would permit a rational jury to find that the FMVSS governed the product risk and the section 82.008(a) presumption of non-liability applied. *See City of Keller*, 168 S.W.3d at 822.

### b. The evidence supports the jury's answer to Question No. 1(c)

After finding that Honda had established the elements of section 82.008(a)'s rebuttable presumption of non-liability, the jury considered whether the Milburns had established the section 82.008(b)(1) exception to rebut the presumption—that the mandatory federal safety standards were inadequate to protect the public from unreasonable risks of injury or damage. Honda argues there is no evidence, or alternatively, factually insufficient evidence, to support the jury's answer "yes" to

–15–

Question 1(c), that the Milburns established the exception in section 82.008(b)(1) that rebuts the presumption.

The Milburns contend that Honda's detachable anchor seat belt design is so confusing that people are unlikely to use it correctly. They urge that the FMVSS are inadequate to protect the public because they do not require manufacturers to ensure that vehicle owners or drivers actually understand the importance of attaching the belt to the anchor buckle when the third row seat is returned to the upright position. In addition, the FMVSS standards do not require the manufacturers to test whether passengers are able to correctly and reliably use the detachable seat belt system when it is retracted into the ceiling. In summary, the Milburns urge that the standards are inadequate to protect the public from unreasonable risks of injury or damage because they do not mandate analysis or testing requirements for usability.

Joellen Gill, the Milburns' Human Factors Engineering Consultant, opined at trial that it should have been foreseeable to Honda that owners would not reliably maintain the seat belt in the anchored position. She also testified that, in her opinion, it should have been foreseeable that a person seated in the third row, center seat would not reliably, correctly fasten the seat belt and would not realize that she was not properly belted. Gill described two usability studies conducted by the Milburns' counsel in which fifty-three people were asked to sit in the third row, center seat of

a Honda Odyssey minivan and fasten their seat belt.[8] The seat belt was not anchored at the seat—it was completely retracted into the ceiling, just as it was on the evening that Sarah was a passenger sitting in the third row, center seat of the 2011 Odyssey minivan. Fifty out of the fifty-three test subjects failed to fasten the seat belt properly—after some initial confusion in attempting to locate the belt, they pulled the shoulder portion of the belt across their bodies and buckled it into the seat belt latch. They did not pull the webbing across their laps to properly anchor the lap-belt portion into the seat belt anchor.

Honda presented evidence that there have been no other lawsuits alleging an injury caused by misuse of the detachable anchor seat belt. In addition, Thomas testified that there have not been any recalls of the detachable anchor system. Honda argues that this evidence confirms that federal standards are adequate to protect the public. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 139 (Tex. 2004) (manufacturer can offer evidence of the absence of other accidents to rebut claim that product is unreasonably dangerous). The Milburns acknowledge that such evidence is relevant, but they contend that it does not conclusively establish that the standards were adequate to protect the public from misuse of the seat belt. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex. 1998) (paucity of reported accidents involving allegedly defective tire is relevant but does not

---

[8] The jury watched selected videos of study participants as they attempted to locate and then properly fasten the seat belt.

conclusively establish that tire is reasonably safe when weighed against other evidence).

Honda also presented evidence that other manufacturers use detachable anchor seat belt systems in their minivans with third-row seats that fold into the floor pan. Honda asserts this further confirms that the federal standards are adequate to protect the public. In response, the Milburns argue that this evidence only confirms that manufacturers have taken advantage of the choice the FMVSS gave them to elect cost savings over safety.

Like many product liability cases, this case was a battle of the experts. The Milburns' experts examined physical evidence, performed tests, reviewed data, performed calculations, criticized Honda's experts, and concluded that the federal standards pertaining to the ceiling-mounted detachable anchor seat belt system for the third-row middle seat were inadequate to protect the public from unreasonable risks of injury or damage. Honda's experts conducted the same examinations, tests, reviews, calculations, and critiques of the Milburns' experts, but concluded the standards *were* adequate to protect the public. The jury properly exercised its prerogative to resolve this conflicting evidence and believed the Milburns' experts. This Court may not second guess the jury's decision.

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we conclude the evidence is legally sufficient to support the jury's "yes" answer to

Question No. 1(c), that the FMVSS applicable to the seat belt system were inadequate to protect the public from unreasonable risks of injury or damage. After reviewing all the evidence, we cannot say the evidence is so weak that the jury finding is clearly wrong and unjust. Thus, the evidence is factually sufficient to support the jury's answer. We overrule Honda's first issue.

## C. Negligent Design

In response to Question No. 1(a), the jury answered affirmatively that Honda was negligent in designing the 2011 Honda Odyssey at the time it left Honda and that negligence was a proximate cause of the injury in question. In its second issue, Honda focuses on three of the elements underlying the jury's answer. Honda contends there is no evidence of: (1) a design defect, (2) a safer and feasible alternative design, and (3) proximate cause. In so doing, Honda challenges the qualifications of the Milburns' experts, and the relevance and reliability of their testimony.

### 1. Expert Testimony – Standard of Review

For expert testimony to be admissible, the expert witness must be qualified to testify about "scientific, technical, or other specialized knowledge," TEX. R. EVID. 702, and the testimony must be relevant and based upon a reliable foundation. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010) (citing *Exxon Pipeline Co v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002)). Whether an expert is qualified under Rule 702 is a matter of judicial discretion, and the trial court's determination on that

issue will not be disturbed on appeal absent a clear abuse of that discretion. *See Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

An expert's testimony is relevant when it assists the jury in determining an issue or in understanding other evidence. TEX. R. EVID. 702. But expert testimony based on an unreliable foundation or flawed methodology is unreliable and does not satisfy Rule 702's relevancy requirement. *Ledesma*, 242 S.W.3d at 39; *Robinson*, 923 S.W.2d at 556. Expert testimony is also unreliable if "there is simply too great an analytical gap between the data and the opinion offered." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998).

In *Robinson*, the Texas Supreme Court set out six non-exclusive factors courts may consider in deciding whether expert testimony is reliable.[9] *Robinson*, 923 S.W.2d at 557. The *Robinson* court acknowledged, however, that there are many factors trial courts may find helpful in determining the reliability of the scientific evidence. *Id*. In *Gammill*, the Texas Supreme Court noted that the *Robinson* factors may not be useful in evaluating expert testimony in automobile accident cases. *Gammill*, 972 S.W.2d at 727; *see also Ledesma*, 242 S.W.3d at 39; *Cooper Tire &*

---

[9] The *Robinson* factors include: "(1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique." *Robinson*, 923 S.W.2d at 557.

*Rubber Co. v. Mendez*, 204 S.W.3d 797, 802 (Tex. 2006). Nevertheless, there must be some basis for the opinion offered to establish its reliability. *Gammill*, 972 S.W.2d at 726. "An expert's bare opinion will not suffice" and is unreliable if "based solely upon his subjective interpretation of the facts." *Volkswagen of America, Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004).

The trial court is the "evidentiary gatekeeper" responsible for excluding irrelevant and unreliable expert evidence. *Zwahr*, 88 S.W.3d at 629. The court has broad discretion to determine the admissibility of evidence and we will reverse only for an abuse of discretion. *Id.* According to the record, the trial court in this case conducted multiple hearings to consider the qualifications of the experts for both parties, and the relevance and reliability of their opinions.

## 2. Design Defect

The Milburns relied on the testimony of several witnesses, including Honda's corporate representative, to support their argument that Honda was negligent in designing a seat belt system that was defective because of the foreseeable risk that owners, drivers, and passengers would not reliably use the seat belt in the correct manner. They offered Joellen Gill, a human factors and safety engineering consultant, as a human factors expert—to evaluate and opine on human interaction with Honda's detachable anchor seat belt system. Honda challenges Gill's qualifications to testify about the defective design of seat belts. Honda asserts that Gill is not an automotive engineer, a mechanical engineer, an automotive expert, or

a seatbelt expert. Further, Honda complains that none of Gill's education or work experience relates to human factors in the context of vehicle safety systems. Gill has never worked in the automotive industry; she has never worked on seat belt issues before; and she has never authored any articles pertaining to human interactions with safety devices in vehicles. Honda argues that because Gill does not have expertise concerning the actual subject about which she is offering an opinion, her opinions are no evidence and should not have been admitted.

Gill was not asked to opine as an expert in seat belt design, automotive or mechanical engineering, or the implementation of the seat belt system. Gill testified that she is licensed as a Certified Human Factors Professional and a Certified Safety Professional and that she has worked in the field of human factors and safety engineering for nearly forty years. Gill explained that "human factors" combines the sciences of design engineering and cognitive psychology—it is the study of how humans interact with all kinds of equipment, vehicles, machinery, and products. She also explained that she did not need to have expertise on a specific product or industry because her knowledge, skill, experience, training and education applies universally across all products and industries in which humans are involved. *See, e.g., Tyson Fresh Meats, Inc. v. Abdi*, No. 07-12-00546-CV, 2014 WL 2447472, at *3–4 (Tex. App.—Amarillo May 28, 2014, pet. denied) (mem. op.) (trial court did not abuse its discretion in determining that expert on human factors and industrial safety was qualified to opine about safety measures for conveyor belts).

Gill ultimately formed five opinions[10] in support of her overall conclusion that Honda's detachable anchor seat belt design is defective from a human factors perspective. She testified that in forming her opinions, she reviewed the police report, photos of the seat belt system, the owner's manual for the 2011 Honda Odyssey, the warning label on the seat belt, and depositions of the driver, passengers and witnesses. She also discussed two usability studies conducted by the Milburns' counsel in which fifty-seven[11] participants were filmed as they entered a Honda Odyssey minivan. The second row seats had been removed to facilitate filming and the third row, center seat's detachable anchor seat belt was unlatched and retracted into the ceiling. Each participant was asked to sit in the third row, center seat, with non-test subjects on either side. Each participant was instructed to put on the seat belt and was filmed while doing so. Out of fifty-three participants, only three participants were able to fasten the seat belt correctly. The other fifty participants fastened the seat belt the same way Sarah fastened it—fastening only the shoulder portion of the belt. Gill testified that if you conduct a usability study in which fifty

---

[10] Gill presented the following opinions: (1) it was or should have been foreseeable to Honda that owners would not reliably maintain the seat belt in the anchored position; (2) it was or should have been foreseeable to Honda that a person seated on the third row center seat would not reliably, correctly fasten the seat belt or even fasten it at all; (3) it was or should have been foreseeable to Honda that a passenger seated in the third row center seat would fail to recognize that they were not properly buckled in; (4) Honda failed to effectively mitigate the hazard of the third row center seat occupants being improperly seat belted; and (5) Sarah's actions were consistent with foreseeable human behavior.

[11] The studies originally included fifty-seven participants. The trial court admitted the videos and audio of fifty-three participants; the court excluded the videos and audio of four participants because they were not seated between two other people, like Sarah was at the time the accident occurred.

out of fifty-three people do something the same way, then you have established a foreseeable use.

Honda asserts that because Gill incorporated unreliable and unscientific out-of-court "experiments" as the basis for her design defect opinions, her testimony should not have been admitted because it was not relevant or reliable. At trial, Honda objected to the studies as flawed, unreliable, and unscientific "experiments." It complained that no expert was present during the tests and there was no effort to establish a good scientific methodology.[12] Honda also argued that because there were so many dissimilarities between the conditions existing at the time of the experiment and the actual event, the "experiments" were not scientifically reliable.[13]

Citing *Fort Worth & Denver Railway Company v. Williams*, the Milburns argued that the usability studies were admissible because there was a substantial similarity between the conditions existing at the time of the event at issue and the conditions existing at the time of the experiment. 375 S.W.2d 279, 281–82 (Tex. 1964) (Out of court experiments conducted in the absence of the opposing party are admissible if there is a substantial similarity between the conditions existing at the time of the event at issue and the conditions existing at the time of the experiment.

---

[12] Honda raised numerous objections to the Milburns' usability studies, complaining about the failure to capture demographic information on test participants or information about their predisposition to use seat belts, the lack of a script, and the questions asked of participants. Honda suggested that filming made the participants nervous and potentially affected their responses.

[13] Honda's list of dissimilarities included: (1) the test was conducted in the light as opposed to the dark of night; (2) the vehicle used in the test did not have a driver; (3) the vehicle used in the test did not have second row seats because they were removed to facilitate filming; and (4) the vehicle was not moving.

The conditions do not have to be identical.). The Milburns provided evidence establishing a predicate for the admission of the studies, including an affidavit from the person who conducted the studies and an affidavit and the deposition of Gill. The Milburns also noted that Honda conducted its own usability study *that was exactly the same* with one critical difference—the seat belt for the third row, center seat, was already anchored to the seat. The Milburns argued that the jury should be allowed to look at the competing studies and decide which study was more similar to what Sarah encountered.

When an experiment is conducted out-of-court, the conditions must be substantially similar but need not be identical. *Benson v. Chalk*, 536 S.W.3d 886, 904 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). "Where there exists a dissimilarity in the conditions, if the differences are minor or are explained to the jury, the admission of the experiment is within the trial court's discretion to determine whether the dissimilarity would cause the evidence to confuse rather than aid the jury and, thus, whether the evidence should be excluded." *Id*. (citing *Williams*, 375 S.W.2d at 282). After viewing the videos of the studies conducted by the Milburns and Honda and considering the arguments of both parties, the trial court allowed the use of the studies. The trial court did not abuse its discretion in finding that the conditions in the Milburns' usability studies were substantially similar to the conditions existing at the time of the event at issue. In addition, the trial court did not abuse its discretion in admitting the videos of the usability studies.

Honda's challenges to Gill's qualifications and Honda's criticisms of Gill's opinions were extensively briefed, argued, and carefully considered by the trial court in a pre-trial hearing to consider Honda's motion to exclude the expert testimony of Gill. At trial, Honda vigorously cross-examined Gill before the jury, focusing on her lack of experience with respect to the automotive industry and seat belts issues. Honda also interrogated Gill about her research, the usability studies, and the basis for each of her opinions. The record establishes that Gill's testimony did not present a case where "there is simply too great an analytical gap between the data and the opinion proffered," or where the expert's testimony amounted to nothing more than a recitation of her credentials and a subjective opinion. *Ledesma*, 242 S.W.3d at 40 (quoting *Gammill*, 972 S.W.2d at 726). Her observations were tied to evidence in the case and this evidence provided support for her conclusions. The trial court did not abuse its discretion by admitting Gill's testimony that Honda's detachable anchor seat belt design is defective from a human factors perspective. In addition, based on this evidence, we conclude the record contains evidence that the detachable anchor seat belt system was a defective design because of the foreseeable risk that owners, drivers, and passengers would not reliably use the seat belt in the manner intended.

### 3. Safer Alternative Design

Honda also asserts that the Milburns failed to produce evidence of a safer and feasible alternative design. In addition to proving a product is unreasonably

dangerous, a plaintiff must prove that (1) there was a safer alternative design; (2) the safer alternative design would have prevented or significantly reduced the risk of injury without substantially impairing the product's utility; and (3) the safer alternative design was both economically and technologically feasible. CIV. PRAC. & REM. § 82.005(a)-(b); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999). The Milburns maintain that an integrated ABTS seat belt design is a safer alternative to the detachable anchor seat belt design used in the 2011 Honda Odyssey. Honda disagrees, arguing that the integrated ABTS seat belt is not a safer and feasible alternative design because: (i) it is not technologically feasible; (ii) it is not economically feasible; and (iii) it will impair the utility of the "magic" seat and the amount of cargo space.

At trial, the Milburns elicited testimony from Steven Meyer, a mechanical engineer specializing in automotive safety systems, to support their argument that an integrated ABTS seat belt design was a safer alternative to the detachable anchor seat belt design used in the 2011 Honda Odyssey. Meyer explained that the industry has long recognized that a three-point seat belt system is the safest. He testified that in analyzing the design and performance of Honda's detachable anchor seat belt system used in the third row, center seat of the Odyssey minivan, he reached the conclusion that it was dangerously easy to use the detachable anchor seat belt as a two-point system by fastening only the shoulder belt. He concluded that the

appropriate design for the third row, center seat is an ABTS system, like the one Honda uses in its Insight model.[14]

Honda does not dispute the existence of ABTS technology; however, it disputes that an ABTS system can be used with the Odyssey's "magic" seat. Meyer acknowledged that in order to support an ABTS system, the third row, center seat would have to be taller and heavier. However, he opined that there was no reason Honda could not keep its "magic" seat and use an ABTS seat belt system. Meyer described how the seat structure could be strengthened so the shoulder portion of the belt could be anchored to the seat back. He also discussed strengthening the attachment of seat to floor. He noted that when the belt is attached to the seat, the seat may be heavier and more difficult to remove. However, the additional weight would not be a problem for this seat because the seat folds down and does not need to be lifted out of the vehicle. He opined that this was not a big technical challenge and was not even complicated—it was merely a packaging issue. Thus, Meyer concluded that a safer alternative design was possible and also described how it could be done. He did not have to actually "build and test" his proposed safer alternative design. *See Sanchez,* 997 S.W.2d at 592. "A design need only prove

---

[14] Meyer conceded that the Honda Insight does not have a "magic" seat; its seats fold down to allow the cargo area to extend forward to the back of the front seats. He described the extended cargo area as relatively flat—it was not perfectly flat but angled slightly upward. He stated that the seat would flatten as weight was placed into the cargo space.

'capable of being developed.'" *Id.* (citing *Boatland of Houston, Inc. v. Bailey*, 609 SW.2d 743, 748 (Tex. 1980)).

Meyer conceded that a detachable anchor ceiling-mounted seat belt system was less expensive than an ABTS seat belt system. He explained that an ABTS system would cost more because Honda would have to strengthen the frame of the seat and ensure that the attachment of the seat to the floor was strong enough. He testified that after reviewing data from manufacturers, he estimated that it would cost around twenty-five to thirty dollars to install an ABTS system on a stowaway seat. On cross-examination, Meyer agreed that in its evaluation of detachable anchor seat belts for seats that fold into the floor pan, the federal government considered the cost and found that installing an ABTS system would cost fifteen dollars more than installing a detachable anchor seat belt system.

Honda contends that Meyer erroneously assumed that all "folding" seats were equivalent. Honda agrees that ABTS is feasible for seats that fold at a hinge and remain in the passenger space; Honda disagrees that ABTS is feasible for seats that fold and stow away into a recessed floor pan compartment, like the Odyssey's "magic" seat. According to Honda, ABTS changes a seat's packaging considerations because the seat must be taller, wider, and heavier to accommodate the ABTS attachments to the seat and the load requirements. Honda's expert, Michael Klima, testified that the "magic" seat's utility stems from its ability to fold all the way into the floor pan, thus creating a flush surface in the passenger space for greater cargo

capacity and ease of cargo loading. He testified that ABTS is not feasible for use with a "magic" seat because ABTS would prevent the seat from folding all the way into the floor.

However, Meyer testified that he had considered the utility of additional cargo space created by the "magic" seat in comparison to the risk of serious injury caused by improperly using the detachable anchor seat belt. He concluded that the risk of serious injury far outweighed the benefit of a little additional cargo space, especially when there was an easy alternative. If, as Klima (Honda's expert) testified, the "magic" seat could not be engineered to accommodate an ABTS seat belt system, Honda could utilize a fold-down seat with an ABTS seat belt system. Honda, however, argues that requiring it to jettison the "magic" seat in favor of a conventional hinged folding seat that remains in the passenger space would substantially impair utility because valuable cargo space would be lost. Honda provided evidence that removing the second row seats and folding the "magic" seat into the floor pan creates approximately 148 cubic feet of available cargo space. Klima compared the Honda Odyssey's cargo space to the cargo space available in a Buick Terraza equipped with an ABTS seat belt system attached to fold-down seats. Because the Terraza's seats did not fold into the floor pan or fold flat, he calculated that the Terraza had 64 cubic feet less cargo space than the Odyssey.

Both parties discuss *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379 (Tex. 1995) in support of their respective positions. In *Caterpillar*, the Texas Supreme Court held

that a proposed safer design that required the protective structure of a front-end loader to be unremovable, rather than removable, would foreclose its intended use in low-clearance areas. The court stated: "Texas law does not require a manufacturer to destroy the utility of his product in order to make it safe." *Id*. at 384 (quoting *Hagans v. Oliver Mach. Co*., 576 F.2d 97, 101 (5th Cir. 1978)). The Milburns argue that slightly diminished cargo space does not equate to destruction or even substantial impairment. They point to the examples of substantial impairment discussed by the *Caterpillar* court and urge that compared to those examples, the effect of using ABTS with a fold-down seat—rather than a "magic" seat—in no way destroys or substantially impairs the Odyssey's utility for transporting passengers or hauling cargo.[15] It merely decreases the amount of available cargo space. However, if the third row seats can be removed, as the second row seats are designed to do, there would not even be a decrease in available cargo space.

Meyer and Klima testified extensively at trial, and both experts were subjected to vigorous cross-examination before the jury. Whatever the basis for their disagreements, it is the province of the jury to resolve such conflicts. See *Miller v. Churches*, 418 S.W.3d 749, 756 (Tex. App.—Dallas 2013, no pet.) (citing *Faust v. BNSF Ry. Co*., 337 S.W.3d 325, 346 (Tex. App.—Fort Worth 2011, pet. denied) ("In the face of conflicting evidence, including conflicting expert testimony, we may not

---

[15] The court stated: "A motorcycle could be made safer by adding two additional wheels and a cab, but then it is no longer a motorcycle. A convertible can be made safer by fully enclosing the cab, but then it is just an ordinary car." *Caterpillar*, 911 S.W.2d at 385.

–31–

substitute our own judgment for that of the jury's.")). The Milburns presented some evidence, and therefore legally sufficient evidence, to support the jury's finding that the ABTS seat belt design is a safer alternative to the detachable anchor seat belt design used in the 2011 Honda Odyssey. *See Gardiner*, 505 S.W.3d at 613. Additionally, considering all the evidence in the record pertinent to that finding, the evidence is not so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Id*. at 615. While Honda and its experts presented conflicting evidence and questioned Meyer's opinions, this evidence simply created a fact issue for the jury to resolve. *See Jackson*, 116 S.W.3d at 761 (jury is sole judge of credibility of witnesses and weight of their testimony).

### 4. Proximate Cause

Honda next asserts that the Milburns failed to establish a causal link between the alleged seat belt design defect and Sarah's injury. During trial, the jury considered conflicting expert testimony based on conflicting factual assumptions. "Courts must 'rigorously examine the validity of the facts and assumptions on which [expert] testimony is based.'" *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 832 (Tex. 2014) (quoting *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009)). "If an expert's opinion is unreliable because it is 'based on assumed facts that vary from the actual facts,' the opinion 'is not probative evidence.'" *Id*. at 832–33. However, an expert's factual assumptions need not be uncontested or established as a matter of law. *Id*. at 833. If the evidence

conflicts, it is the province of the jury to determine which evidence to credit. *See Cooper Tire*, 204 S.W.3d at 804.

The Milburns presented the expert testimony of Paul Lewis, a biomedical engineer, who predicated his causation conclusion on the assumption that Sarah was wearing only the shoulder strap portion of her seat belt. When the Odyssey was struck on the passenger side, Sarah's body moved forward and to the right. Without a lap belt to keep her hips in place, Sarah continued moving forward until her neck was "clotheslined," caught by the belt at her neck while the rest of her body was unrestrained. According to Lewis, the belt acted as a fulcrum, causing the cervical portion of Sarah's spine to dislocate and fracture from the force of her still-moving body. The C6 vertebra experienced a subluxation and the C7 vertebra experienced a compression fracture. These injuries to the vertebrae damaged Sarah's spinal cord and resulted in quadriplegia.

Honda challenges Lewis's assumption that Sarah was wearing the shoulder portion of her seat belt and urges that Lewis's testimony was unreliable and legally insufficient. Honda's expert, Dr. Catherine Corrigan, a biomechanics engineer, based her opinion on the assumption that Sarah was not wearing a seat belt at all. Corrigan opined that Sarah's entire body moved mostly to the right and somewhat forward due to the force of the passenger-side impact. She stated that Sarah sustained a "diving" injury to her neck when her head struck the roof rail area along the side of the vehicle—the injury occurred because Sarah's body continued to move but her

head was stopped against the roof railing. According to Corrigan, this compressed Sarah's neck, causing the fractures and dislocation.

Honda emphasizes the lack of physical evidence that Sarah's seat belt was fastened at the time of the accident. First, there was no physical evidence of Sarah's seat belt use based on load marks on the seat belt or other marks inside the vehicle. A "sled test" conducted by Honda simulating a side impact demonstrated that there would have been physical evidence of loading shown as marks on the seat belt and the latch plate if Sarah had been wearing it. According to the Milburns' experts, however, Honda's sled test did not accurately depict what happened in the accident that forms the basis of this lawsuit. For example, Meyers noted that a significant discrepancy in the sled test was not placing three test dummies in the third row seats, to simulate the three passengers seated in the third row of the Odyssey minivan. In addition, Meyers testified that not all collisions involving restrained passengers result in load marks on the seat belts. The presence, or absence, of load marks depends on the type of belt and the type of collision. He explained that load marks depend on force and friction—force and friction on the belt are most concentrated where the belt turns a corner. Meyers noted that because Sarah was wearing only the shoulder belt, the belt did not turn a corner as it would have if the lap belt had also been fastened. Therefore, it did not surprise him that the seat belt did not have load marks. He also explained that because rollover collisions tend to take a long time

and happen over a long distance, the force on a belt may not rise to the level of leaving load marks.

Second, Honda contends there was no "seat belt sign" on Sarah's body when she was admitted to the hospital.[16] The Milburns disagree, pointing to an illustration of Sarah's injuries used by Corrigan, Honda's expert, at trial. According to the Milburns, this illustration depicted diagonal abrasions or contusions across Sarah's torso—the seat belt sign. Even if Sarah's torso had been unmarked, Lewis testified that in his experience, he had observed more severe crashes in which passengers did not have a single belt mark on them, even though it was obvious they were belted.

Sarah's testimony at trial supports Lewis's factual assumption that Sarah was wearing the shoulder portion of her seat belt. She described climbing into the Odyssey's third row, center seat, reaching up and pulling the ceiling-mounted seat belt across her body, and buckling herself in. After the accident, she remembered hanging upside down by her seat belt. She also remembered someone telling her they were going to cut her down and get her out of the vehicle. Sarah testified there was no doubt in her mind that she had put on her seat belt.

In addition, other witnesses confirmed that Sarah was wearing her seat belt. Emily Klein, who was sitting to Sarah's right, testified that she saw Sarah reach up, pull down a seat belt, pull it across her body, and click it in. Klein also remembered

---

[16] A "seat belt sign" is usually a diagonal abrasion or contusion pattern across the torso consistent with a shoulder belt, or across the iliac crest consistent with a lap belt.

that after the accident, Sarah was suspended and still partially in her seat. Allison Fox, who was sitting to Sarah's left, testified that she saw Sarah hanging upside down and it seemed like she was stuck in her seat belt. Benjamin Godfrey, who was sitting on the right side of the second row, recalled that paramedics had to go through the back of the vehicle to unbuckle Sarah and get her down onto a backboard. William Martinez, the investigating police officer, noted in his report that Sarah was wearing her seat belt (although he erroneously described it as the lap belt only). John Pope, a Dallas Fire and Rescue paramedic also filed a report stating that Sarah was wearing a seat belt.[17] Honda discounts the testimony of these eye-witnesses as a "jumble of evidence." However, it is sufficient to support the jury's implicit finding—and Lewis's factual assumption—that Sarah was wearing only the shoulder portion of her seat belt when the accident occurred. *See City of Keller*, 168 S.W.3d at 820 ("It is the province of the jury to resolve conflicts in the evidence.").

Honda also challenges Lewis's explanation of the mechanism of injury—how the position of the shoulder belt on Sarah's body and her movement inside the vehicle during the collision acted in combination to cause her injury. Corrigan testified that Lewis's theory defied the law of physics by depicting an occupant who was moving in the wrong direction. However, the record establishes that both Lewis and Corrigan testified that during the collision, Sarah's body moved to the right and

---

[17] The statement in Pope's report was based on information that Sarah gave to another paramedic at the scene. Nevertheless, it corroborates Sarah's trial testimony.

forward. Corrigan also opined that the specific injury Sarah received could not be produced by a seat belt across the neck. She suggested that if a shoulder belt had engaged at neck level, it would have caused a "hangman's fracture" resulting from the neck being forced into extension when the belt caught under the chin.

During his testimony, Lewis explained that when a passenger is clotheslined by the belt, the type of injury depends on where the belt is located in relation to the spine. If the belt is higher, a hangman's fracture can occur because the belt catches the passenger higher on the neck forcing extension. If the belt is lower on the neck, the head will continue to flex forward over the belt.

The issue of causation came down to a battle of the experts. The jury exercised its prerogative in resolving this conflicting evidence, and found the Milburns' experts' testimony more credible. *See Cooper Tire*, 204 S.W.3d at 804; *Miller*, 418 S.W.3d at 756–57. Again, this is what juries do. Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we conclude the evidence is legally sufficient to support the jury's verdict that Honda was negligent in designing the 2011 Honda Odyssey at the time it left Honda and that negligence was a proximate cause of the injury in question. After reviewing all the evidence, we cannot say the evidence is so weak that the jury finding is clearly wrong and unjust. Thus, the evidence is factually sufficient to support the verdict. We overrule Honda's second issue.

## D. Comparative Apportionment

In its third issue, Honda insists that the trial court erred in granting the Milburns' motion for partial summary judgment on Honda's affirmative defenses against the Uber entities for negligence, negligent undertaking, agency and joint liability, negligent misrepresentation, and fraud. Honda urges that by granting the Milburns' motion, the court skewed the trial court proceedings and erroneously excluded the Uber entities from the jury's consideration of proportionate responsibility.

After the Milburns settled with all of the defendants except for Honda,[18] the trial court granted an agreed motion to dismiss the settling parties from the lawsuit. Honda non-suited its cross-claims against the settling parties. The Milburns then filed their first amended petition solely against Honda. Honda filed its first amended answer to the Milburns' amended petition and asserted affirmative defenses with respect to all of the settling parties, Sarah Milburn, and Richard DeLeon, the driver of the pickup truck that collided with the Odyssey minivan. Honda sought a proportionate responsibility submission for the Uber entities in the jury charge under chapter 33 of the civil practice and remedies code. *See* CIV. PRAC. & REM. § 33.003(a)(3).

---

[18] The Milburns entered into a settlement agreement with the Uber entities, Yusufzai, and Kohistani.

The Milburns filed a motion for partial summary judgment to preclude submission of the settling Uber entities from a proportionate responsibility question. The Milburns asserted that any liability of the Uber entities was entirely derivative of Uber driver Yusufzai's liability and, therefore, provided no basis for submitting the Uber entities under section 33.003(a). They argued that there was no evidence to support Honda's affirmative defense theories of fraud or negligent misrepresentations as to Uber's safety. They also argued that because Honda asserted these affirmative defenses as to all of the Uber entities as a group without distinguishing between them, there was no evidence to support a separate submission of each of the Uber entities. *See Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995) (no evidence identified who may have made alleged false statement). The trial court granted the Milburns' motion for partial summary judgment as to the Uber entities.[19] The court subsequently denied Honda's request for submission of the Uber entities' proportionate responsibility in the jury charge.

## 1. Standard of Review – Summary Judgment

We review the grant of summary judgment de novo. *See Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 607 (Tex. 2013). The party moving for summary judgment bears the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see Joe v. Two*

---

[19] The motion was granted in part as to the Uber entities and denied as to DeLeon. The trial court found that more than a scintilla of evidence had been brought forward to support a comparative responsibility claim against DeLeon, the driver of the pickup truck that hit the Odyssey minivan.

*Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004); *Gonzalez v. VATR Constr. LLC*, 418 S.W.3d 777, 782 (Tex. App.—Dallas 2013, no pet.). A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if it conclusively establishes all elements of an affirmative defense. *Gonzalez*, 418 S.W.3d at 782.

## 2. Proportionate Responsibility

The Texas legislature clearly intended to permit defendants to join as "responsible third parties" those persons whose liability is direct. *See* CIV. PRAC. & REM. §§ 33.003, 33.004, 33.011. On its face, section 33.003(a) requires settling parties to be included in the apportionment question. However, such inclusion is conditional. Section 33.003 provides that the jury is to allocate responsibility only among those persons who engaged in "conduct or activity" that caused or contributed to cause the "harm for which recovery of damages is sought." *Id*. § 33.003(a). This Court and many of our sister courts have regularly held that comparative apportionment is not proper if the party's only responsibility was derivative of the liability of another. *See, e.g., Rosell v. Cent. W. Motor Stages, Inc*., 89 S.W.3d 643, 656–57 (Tex. App.—Dallas 2002, pet. denied) (holding that because driver's negligence is passed through to owner "it was proper to apportion fault among those directly involved in the accident"); *Loom Craft Carpet Mills, Inc. v. Gorrell*, 823 S.W.2d 431, 432 (Tex. App.—Texarkana 1992, no writ) ("We believe the better rule is to apportion fault only among those directly involved in the

–40–

accident…."); *Conkle v. Chery*, No. 03-08-00379-CV, 2009 WL 483226, at *4 (Tex. App.—Austin Feb. 25, 2009, no pet.) (mem. op.) (preferred approach is to apportion liability among those directly liable for the accident). *But see Bedford v. Moore*, 166 S.W.3d 454, 461–63 (Tex. App.—Fort Worth 2005, no pet.) (holding that negligent entrustment requires owner to be included in jury's apportionment question, relying on original version of *F.F.P. Operating Partners, L.P. v. Duenez*, which was later withdrawn and superseded by *Duenez*, 237 S.W.3d 680, 686 (Tex. 2007)). Here, the parties agree that the Uber entities are "settling persons." They dispute whether the Uber entities' liability was derivative of Yusufzai's negligence, if any.

### a. Negligence, Negligent Undertaking, Agency and Joint Liability

Here, the trial court determined, and we agree, that the *Rosell* decision controls our consideration of Honda's affirmative defenses as to the Uber entities on theories of negligence, negligent undertaking, and agency and joint liability. Honda alleged that the Uber entities breached a duty of care that arose by virtue of their employment, agency, joint liability with, or control of Yusufzai. Honda urged that the Uber entities caused or contributed to the harm by: (1) hiring, supervising, and training Yusufzai as an Uber driver; (2) arranging and dispatching drivers to customers, thus assuming a duty that the driver would provide a safe trip; (3) exercising control over Yusufzai by establishing safety policies for its drivers; (4) providing customer support software and services for riders and drivers that promoted Uber's commitment to safety; and (5) engaging in a joint enterprise—

–41–

Yusufzai paid twenty-five percent of each fare to Uber. Honda reasons that this conduct by the Uber entities—"upstream" of Yusufzai, the actual tortfeasor—was a concurrent cause of the ultimate conduct by Yusufzai that caused the harm for which the Milburns sought recovery of damages. Therefore, according to Honda, section 33.003(a) mandated that the jury be allowed to apportion liability to the Uber entities.

The Milburns disagree. In their motion for partial summary judgment, the Milburns asserted that all of the theories asserted in Honda's affirmative defenses seeking to apportion liability to the Uber entities are derivative of the alleged negligence of the Uber driver, Yusufzai. In other words, if the jury found that Yusufzai was not negligent, there is no theory alleged by Honda under which the Uber entities could be found liable. The Milburns urge that under *Rosell*, the Uber entities' liability was derivative as a matter of law.

*Rosell* involved a wrongful death action against Rieve, the driver of a Central West bus that struck and killed a motorist who had stopped to help at an accident site, and Central West, the bus driver's employer. *Rosell*, 89 S.W.3d at 649. The plaintiffs alleged that Central West was negligent in hiring, supervising, and entrusting the bus to an incompetent driver, whose subsequent negligence caused the death of plaintiffs' decedent. *Id*. The plaintiffs argued that the trial court erred by refusing to submit the employer separately from the driver in the apportionment question. *Id*. at 656. However, this Court rejected their argument. We analogized the

negligent entrustment and negligent hiring claims against the bus driver's employer to a respondeat superior theory of recovery as follows:

> Although negligent entrustment and negligent hiring are considered independent acts of negligence, these causes are not actionable unless a third party commits a tort. In that respect, these causes are similar to the respondeat superior theory of recovery where, unless the employee commits a tort in the scope of employment, the employer has no responsibility. In reviewing the application of section 33.033 to responsibility, we observe that, while the statute on its face requires all defendants to be included in the apportionment question, it would not be proper for an employer to be included along with the driver if its only responsibility was that of respondeat superior. Section 33.003 has not been used to require both a driver and employer to be submitted in the apportionment question in that situation.

*Id.* at 656–57 (internal citations omitted).

Honda argues that *Rosell* does not apply to the facts in this case because Yusufzai was not an Uber employee who was acting in the course and scope of his employment when the accident occurred. In *Rosell*, Central West stipulated that Rieve was its employee acting in the course and scope of his employment when the bus struck the motorist. *Id.* at 654. Here, Uber's corporate representative asserted that Uber drivers are not employees—they are independent contractors. Thus, according to Honda, because Uber is not Yusufzai's employer, any limitation on separately submitting a vicariously liable employer in the apportionment question does not apply. We do not agree.

*Rosell* clearly addressed theories similar to the employer-employee relationship of respondeat superior, such as negligent entrustment and negligent

hiring, and concluded that they were not actionable unless the third party had committed a tort. *Id*. We explained:

> [T]he causes of action for negligent entrustment and hiring are a means to make a defendant liable for the negligence of another. Once negligent hiring or entrustment is established, the owner/employer is liable for the acts of the driver, and the degree of negligence of the owner/employer is of no consequence. Thus, because Rieve's negligence would be passed on, it was proper to apportion fault among those directly involved in the accident.

*Id*. at 657. Thus, limitation on apportioning liability is not restricted to an employer-employee relationship of respondeat superior. *Id*. Given the absence of a clear indication of legislative intent to change established law to require apportionment in cases of derivative liability, this Court concluded that the traditional rule of non-apportionment continues to be the law in Texas. *Id*.

Honda's affirmative defenses for negligence, negligent undertaking, and agency and joint liability all depend upon the conduct of Yusufzai, the Uber driver. If a party is derivatively liable for the conduct of one involved in an accident—whether it be because of negligent entrustment, negligent hiring, or any theory where causes are not actionable unless a third part commits a tort—then that derivatively responsible party is not submitted on the apportionment question. *Id*. at 656–57. We conclude that the trial court did not err in granting partial summary judgment with respect to Honda's affirmative defenses for negligence, negligent undertaking, and agency and joint liability. *See Joe*, 145 S.W.3d at 157.

## b. Negligent Misrepresentation and Fraud

Honda contends that the Uber entities made false representations to the public, and to Sarah, that Uber is committed to safety and provides safe transportation services. Honda refers to Uber's marketing materials in which Uber promises the safest possible platform for Uber riders and drivers, including background checks, motor vehicle checks, driver safety education, and the development of safety features in its App and insurance. Honda contends that despite such representations regarding safety, the Uber entities failed to update background checks or monitor the performance of individual drivers. Honda asserts that Sarah relied upon safety representations made by the Uber entities and, if not for the false representations, she would not have: (1) used Uber's software and services; (2) accepted a ride that had been requested through and dispatched by Uber's App; (3) gotten into Yusufzai's vehicle; and (4) been injured.

In support of its assertions of fraud and negligent misrepresentation, Honda refers to Sarah's deposition in which she was asked if she thought it would be safer (safer than drinking and driving) to use Uber to transport her. Sarah responded, "yes." She was then asked, "And you were relying on Uber to provide you safe transportation that evening," to which she also responded, "yes." Honda asserts that this summary judgment record established a triable issue of fact with respect to false representations of material fact regarding Uber's safety, which were made to and

relied upon by Sarah, and which Honda should have been allowed to fully develop at trial.

To establish fraud, a party must show the following: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). The Milburns contend there is no evidence that Sarah was aware of any specific safety representations made by the Uber entities, that any such representations were false, or that she relied upon anything the Uber entities said. Sarah did not access the Uber App to request that an Uber driver be dispatched to provide a ride for the group of friends. In her deposition, Sarah stated that she thought it would be safer to use Uber on the night of the accident. However, the Milburns argue that is not evidence of fraud—Sarah was merely describing the group's decision-making process, not referring to a specific safety representation by an Uber entity.

Honda alleged that Sarah relied upon safety representations made on an Uber website. However, Sarah stated in her deposition that she never looked at the website. In a post-accident television interview, Sarah stated that she put her faith in

–46–

Uber, believing it was safe because they market themselves in that way. The trial court noted that it was not enough that Uber had commercials, advertisements, or a website that Sarah may or may not have ever seen—there had to be a false representation made to Sarah upon which she relied. However, in response to the trial court's inquiry, Honda was unable to identify evidence in the summary judgment record of a specific representation in Uber's marketing upon which Sarah relied.

Honda cannot rely on statements in Uber marketing materials in which Uber promises the safest possible platform for Uber riders and drivers because such statements involve mere opinion or puffery. *See Diais v. Land Rover Dallas, L.P.*, No. 05-15-00115-CV, 2016 WL 1298392, at *4 (Tex. App.—Dallas Apr. 4, 2016, no pet.) (mem. op.) (dealer's statements that car was most luxurious, rugged vehicle, with supercharged, high performance engine was mere opinion or puffery); *see also Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (statements that building was "superb," "super fine," and "one of the finest little properties in the City of Austin" were not misrepresentations of material fact but merely opinion and puffery that could not constitute fraud); *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 464 (Tex. App.—Dallas 1990, writ denied) (statements by salesman that Mercedes is the best engineered car in the world is not an actionable misrepresentation). Honda failed to present evidence of at least two of the required elements to support its affirmative defense of fraud—that a representation about

Uber's safety was made to Sarah, or that Sarah relied upon an actionable representation about Uber's safety. Accordingly, we affirm the summary judgment as to Honda's affirmative defense of fraud. *See Gonzalez*, 418 S.W.3d at 782.

The parties dispute whether negligent misrepresentation can be the basis for an affirmative defense as to the Uber entities. The Milburns contend that negligent misrepresentation is a business-related tort—not a claim authorizing recovery of damages for personal injuries. Citing *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, the Milburns explain that the tort of negligent misrepresentation relates to a misrepresentation made by a professional and that professional's independent duty to a nonclient based on the professional's awareness of the nonclient's reliance on the misrepresentation and the professional's intention that the nonclient so rely. 991 S.W.2d 787, 792 (Tex. 1999). Honda, however, contends that Texas law permits negligent misrepresentation claims against non-professionals. *See Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (considering scope of lender's duty to avoid negligent misrepresentations to prospective borrowers).

The parties agree that Texas law permits recovery of pecuniary losses suffered as a result of reliance on a negligent misrepresentation. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998) (negligent misrepresentation damages are those necessary to compensate plaintiff for pecuniary loss of which misrepresentation is legal cause). The Milburns contend that the legal cause of the

damages in this case was not negligent misrepresentation. Instead, the legal cause was the injury caused by the defect in the Honda Odyssey that left Sarah a quadriplegic. Therefore, negligent misrepresentation cannot serve as a basis for submission on the proportionate responsibility question as to Sarah's harm, because Honda failed to prove that any misrepresentation by Uber was the legal cause of any pecuniary loss. *See* CIV. PRAC. & REM. § 33.003 (determining proportionate responsibility for each person's causing or contributing to cause the harm for which recovery of damages is sought).

The record establishes that Honda failed to present evidence of at least two of the required elements to support its affirmative defense of negligent misrepresentation—that Sarah relied upon a false representation made by Uber about its safety, and that Sarah's reliance upon a misrepresentation by Uber was the cause of the harm she suffered. Accordingly, we affirm the summary judgment as to Honda's affirmative defense of negligent misrepresentation. *See Gonzalez*, 418 S.W.3d at 782.

For the reasons discussed above, we conclude that the trial court did not err in granting the Milburns' motion for partial summary judgment as to the Uber entities. We overrule Honda's third issue.

## CONCLUSION

We affirm the trial court's judgment.

190850f.p05

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

AMERICAN HONDA MOTOR
CO., INC., Appellant

No. 05-19-00850-CV     V.

SARAH MILBURN, JOHN
MILBURN, AND CAROLYN
MILBURN, Appellees

On Appeal from the 116th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-16-16470.
Opinion delivered by Justice
Pedersen, III. Justice Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees SARAH MILBURN, JOHN MILBURN, AND CAROLYN MILBURN recover their costs of this appeal from appellant AMERICAN HONDA MOTOR CO., INC.

Judgment entered this 24th day of November, 2021.